[Cite as *State v. Smith*, 2019-Ohio-5199.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-525 |
| v. | : | (C.P.C. No. 17CR-6231) |
| Rafael A. Smith, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 17, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher.*

**On brief:** *Dennis C. Belli*, for appellant. **Argued:** *Dennis C. Belli.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Rafael A. Smith, appeals a judgment of the Franklin County Court of Common Pleas entered on May 30, 2018, sentencing him to serve 16 years for two consecutively sentenced counts of felonious assault perpetrated against his girlfriend. Because we find that none of Smith's four assignments of error are well-taken, we overrule each of them and affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On November 16, 2017, a Franklin County Grand Jury indicted Smith for attempted murder, three counts of felonious assault, kidnapping, domestic violence, and violation of a protective order. (Nov. 16, 2017 Indictment.) Most of the charges stemmed from a single evening in which Smith administered a savage beating to his girlfriend, D.M. *Id.*; *see also* State's Exs. A-C. Smith initially pled not guilty, but on April 16, 2018, he

changed his plea to guilty of two counts of felonious assault in exchange for dismissal of the remaining counts.  (Nov. 20, 2017 Plea Form; Apr. 16, 2018 Plea Form.)

{¶ 3}  Following Smith's guilty plea, the trial court ordered a presentence investigation.  (Apr. 16, 2018 Plea Tr. at 13, filed July 2, 2018.)  In addition, the prosecution filed a sentencing memorandum requesting maximum consecutive sentences and submitted exhibits directly to the trial court's chambers.  (May 18, 2018 Sentencing Memo. at 2.)  The exhibits include a police report of two interviews with Smith's girlfriend, D.M., in which she explained that on the night in question, Smith beat her with his fists, slammed her face into bedposts, and eventually strangled her into unconsciousness.  (State's Ex. A at 2-3.)  She said she felt "he was killing me, I thought he did kill me." *Id.* at 4.  The exhibits also include medical records and pictures of D.M.'s face taken at the hospital in the immediate aftermath of the beating, together with her Georgia photo ID.  (State's Exs. B-C.)  The list of D.M.'s injuries alone is four pages long and, due to the swelling, discoloration, and other facial damage, the pictures of her in the hospital are unrecognizable as the same woman pictured in the photo ID.  (State's Exs. B-C.)

{¶ 4}  Six days after the prosecution filed its sentencing memorandum and exhibits, the trial court held a sentencing hearing.  During the sentencing hearing, the defense characterized Smith's crimes as an "anger management issue that his family has recognized and has counseled him to seek help for."  (May 24, 2018 Sentencing Tr. at 3, filed July 9, 2018.)  Smith's attorney noted that the victim had requested that Smith not be prosecuted and then he called the victim to give a statement at the sentencing hearing.  (Sentencing Tr. at 3.)

{¶ 5}  D.M. challenged a number of factual assertions in the prosecution's sentencing memorandum, portraying the event as a mutually intoxicated altercation that got out of hand and downplaying the nature of her injuries. *Id.* at 4-6.  She explained that she and Smith love each other very much and minimized the abuse, saying that they have "gone through things together.  All couples do." *Id.* at 6.  She closed by begging that Smith be released without further punishment so that they could "work this out as a family." *Id.* at 6-7.

{¶ 6}  Smith's father spoke next.  He opined that when his son and his girlfriend go "out to party, they go through these problems.  I don't know if it's the alcohol or, like, certain

medications or what; but they both attack each other.  It happens numerous times."  *Id.* at 7-8.  He opined that as long as his son is on his proper medication, though, "he'll be all right."  *Id.* at 8.  Following these remarks, Smith's attorney clarified that Smith was on anxiety and depression medications, Buspar and Lexapro.  *Id.*

{¶ 7}  The State then introduced the three exhibits it had previously submitted to chambers in support of its sentencing memorandum.  *Id.* at 9.  The prosecutor pointed out that in the recitation of events D.M. "initially" gave to police, she articulated two specific types of assaults: blunt force trauma (from fists and slamming her head into bed posts) and strangulation to the point of unconsciousness.  *Id.*  In that initial recitation, D.M. reported that the assaults occurred over a significant period of time and resulted in several distinct injuries: a broken hand, numerous facial fractures, broken orbital bones, and loss of consciousness.  *Id.*  The prosecution accordingly argued that the two felonious assault counts should not be merged into a single offense for conviction and sentencing purposes.  *Id.*  The prosecution also noted Smith's extensive history of allegations of domestic violence against D.M. and other women (most but not all of which were dismissed).  *Id.* at 9-10.  The prosecution called attention to a statement allegedly made by Smith during his arrest, "[t]hat bitch won't file charges on me.  She knows better[;] just like last time."  *Id.* at 10.  The State further mentioned that Smith had accumulated several charges for violating protection orders in the aftermath of the incident because he would not stop contacting D.M. *Id.*  The State closed by requesting a significant prison sentence.  *Id.* at 11.

{¶ 8}  Smith's attorney responded that this crime was a single assaultive incident in a bedroom and that this was, as a consequence, really a single felonious assault.  *Id.* at 12.  The defense therefore argued that the two counts should merge into one.  *Id.*  The defense also suggested that the statements Smith made to the police may have been "fueled by alcohol."  *Id.*

{¶ 9}  The court then inquired whether Smith, himself, "want[ed] to say anything before [the court] impose[d] sentence?"  *Id.*  Smith said he would and began by suggesting that there was a great deal of confusion about what happened that evening and that really the fault lay in both D.M. and himself.  *Id.* at 12-13.  He suggested that she "got into something with somebody else and me" (meaning another altercation with a female assailant) on the night in question.  *Id.* at 13-14.  The trial court suggested, in light of his

statement, that Smith clarify the extent of his participation in the beating by circling the injuries he believed he inflicted on the photographs of D.M.'s injuries. *Id.* at 14. Smith complied and circled virtually all the injuries to D.M.'s face and neck. *Id.* at 14-15; *see also* State's Ex. C. Smith further said that this was not a one-way street and that he too had suffered injuries in the form of scratches on his lips. *Id.* at 15-16. The trial court asked if D.M. had been charged for the injuries she inflicted upon him and he indicated she had not. *Id.* The trial court then inquired if there was "anything else you want to say to me?" *Id.* at 16. Smith responded, "No, ma'am." *Id.*

{¶ 10} The trial court then pronounced sentence and, in so doing, expressed personal outrage:

> THE COURT: It is rare that I come into a sentencing circumstance where I am literally shaking because I am so outraged by what I have heard and by what I have seen. I am rarely speechless when it comes to what I must do as a judge here in this courthouse, but I am literally furious and speechless.
>
> Let me say to you first, [D.M.], I don't normally address victims. You are a beautiful woman, and I am concerned by the fact that you are investing so much time and energy in managing Mr. Smith's choices versus finding and releasing the powerful and beautiful woman that you are.
>
> The fact that you have done so much research to assist Mr. Smith when he has conceded what he has done to you hurts my heart, and I know that you don't want to hear anything that I have to say because love is a very powerful thing. And, candidly, the psychology of abuse is an even more powerful thing. But I am hopeful that one day you will come to the realization that you do not have to subject yourself to this kind of behavior because this is not what love is. This is not what companionship is. This is not what care is. This is not what concern is. This is nothing to which you should have to be subjected.
>
> As to you, Mr. Smith, you, sir, are one of the most narcissistic defendants that I have ever had the great displeasure of having in my courtroom. Your arrogance is astounding. Don't shake your head no at me like I don't know exactly what I'm talking about.

I have read your presentence report, and I absolutely believe the version of events that was first provided to police officers. They have absolutely no incentive to suggest that you would say -- and I hate this word -- That bitch won't press charges just like the last time. She knows better just like last time.

I have no reason to believe that anybody would manufacture these kinds of facts, that you would drag this woman up the stairs, that you would pick her up by her throat and throw her on a bed and assault her to the point that she reported to police originally that you believed that you had killed her.

You can shake your head no. I don't believe you.

[SMITH]: Ms. Cocroft, [D.M.] is right here. You can ask her.

THE COURT: You don't need to point out who is here because I've been doing this work long enough to know that the psychology of abuse suggests that an abused person will always defend the abuser. And there is a pattern of behavior out of Georgia which suggests that there have been incidents that have not resulted in convictions where there have been violations of protection orders; there has been physical abuse. And I am certain that [D.M.] recanted those allegations in an effort to protect you and really to protect herself.

So you don't need to point out to me that [D.M.] is here and that she can refute that which has been established by your own circling of the damages that you've done to her. You've already admitted to me what you did to her, so hearing from her is not going to change the narrative to which you've already agreed to today, sir.

[SMITH]: Ms. Cocroft.

THE COURT: What?

[SMITH]: She and I were involved in this together. This was not just something that happened.

THE COURT: I'm not interested in hearing about your argument of mutual combat when this woman was beaten into unconsciousness, when her eye was protruding from the socket.

[SMITH]: Ms. Cocroft.

> THE COURT: I don't want you to say anything else to me to attempt to justify your physical brutality. I don't want to hear it. There is no excuse. I will not permit you to continue to violate [D.M.]. Even though she doesn't want my protection necessarily today, I'm not going to permit you to continue to use her as a shield for your willful actions. That day is over.
>
> You are an abuser. You are a violent man. You have absolutely no regard for the women in your life.
>
> You have a history of violating women because you punched the mother of your child. That is what you do, and you were convicted, so don't try to tell me it didn't happen.
>
> And you have a 7-year-old son who is watching you, who is learning how to treat people based on how you treat people. And do you think I'm anything close to eager to allow you to be in his life so that he can watch you continue to brutalize people?
>
> I have never been so furious. The way that you have orchestrated all of this, the strings that you are pulling, the way that you are manipulating people and situations to advance your own selfish motives is outrageous to me. You are completely offensive to me, and I'm just going to get to the factors for felony sentencing so that I can move on.

*Id.* at 16-20.

{¶ 11} The court then catalogued and applied the sentencing factors, finding several factors marking the crime a more serious version of the offense. *Id.* at 21-24. The court found that the mismatch in strength and inebriation of the victim made the victim physically vulnerable, that the victim suffered serious physical and psychological harm, that Smith's relationship with D.M. facilitated the offense, that the crime was perpetrated against a household member, and that the offense was motivated by prejudice against females (as illustrated by Smith's history of abuse against women). *Id.* The trial court said it found no factors indicating the offense was less serious because it entirely disbelieved the version of the offense Smith and D.M. presented during the hearing. *Id.* at 24-25, 27. The trial court also found that Smith's conduct, lack of remorse, and criminal history of abusing women made it likely he would reoffend. *Id.* at 27-28. At one point during the court's recitation, Smith interrupted to indicate that he had also fought with a man and that he had not punched, but only pushed, the mother of his child. *Id.* at 25-26. The trial court

discussed the matter with Smith then indicated, "Okay.  So I just want you to be quiet for now.  I do.  I want you to be quiet.  I do."  *Id.* at 26.

{¶ 12} The trial court found no reason to depart from the presumption of prison time, stating, "I've never had a case where it's been so clear-cut about what it is that I'm going to do."  *Id.* at 28-29.  It then found that the offenses did not merge based on the fact that there were several species of assault perpetrated against D.M., each with a distinct animus.  *Id.* at 30.  The trial court imposed the maximum of eight years on each of the felonious assault counts.  *Id.* at 31.  Then the court found:

> [B]ecause the Court believes that no single sentence can satisfy that course of conduct, because of the danger that the conduct poses to the safety of the community, because of the seriousness of the injuries, and in order to ensure the safety of the community, those sentences will run consecutive with each other for a total of 16 years of incarceration with the Department of Rehabilitation and Correction with 198 days of jail time credit. The Court does find that as a matter of fact that these are the most serious forms of these offenses.

*Id.*  The trial court issued a judgment entry six days later memorializing the sentence issued orally.  (May 30, 2018 Jgmt. Entry.)

{¶ 13}  Smith now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 14}  Smith presents four assignments of error for review:

> [1.] THE TRIAL COURT VIOLATED DEFENDANT-APPELLANT'S RIGHTS UNDER THE DOUBLE JEOPARDY CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION BY REFUSING TO MERGE HIS TWO CONVICTIONS FOR FELONIOUS ASSAULT PURSUANT TO THE UNIT OF PROSECUTION RULE, AND/OR R.C 2941.25, THE ALLIED OFFENSES STATUTE.

> [2.] DEFENDANT-APPELLANT WAS DEPRIVED OF HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND A FUNDAMENTALLY FAIR SENTENCING PROCEEDING DUE TO THE A) THE PROSECUTOR'S SUBMISSION OF FALSE INFORMATION SUBMITTED BY THE PROSECUTOR, B) THE TRIAL COURT'S PREDISPOSITION OF ANGER AND OUTRAGE, AND C) ITS

REFUSAL TO ALLOW HIM TO ALLOCUTE REGARDING A STATUTORY SERIOUSNESS FACTOR.

[3.] THE IMPOSITION OF CONSECUTIVE PRISON TERMS FOR TWO COUNTS OF FELONIOUS ASSAULT WITHOUT A PROPORTIONALITY FINDING REQUIRED BY R.C. 2929.14(C)(4) RESULTED IN PLAIN ERROR.

[4.] DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, DUE TO THE COMBINED PREJUDICIAL IMPACT OF SEVERAL INSTANCES OF DEFICIENT PERFORMANCE DURING THE SENTENCING PHASE.

## III.  DISCUSSION

### A. First Assignment of Error – Whether the Trial Court Erred by Convicting and Sentencing Smith on Two Counts of Felonious Assault

{¶ 15} The Ohio statute on allied offenses provides as follows:

(A) Where the same conduct by [the] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶ 16} The Supreme Court of Ohio has explained how to apply this statute:

Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph three of the syllabus. Whether offenses were "committed separately" is self-explanatory, but the Supreme Court has defined "dissimilar import" in the following way:

> Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Ruff* at paragraph two of the syllabus. The Court has also defined "animus" as "purpose, intent, or motive." *Newark v. Vazirani*, 48 Ohio St.3d 81, 84 (1990)[1], quoting *State v. Blankenship*, 38 Ohio St.3d 116, 119 (1988) (Whiteside, J., concurring); *see also Black's Law Dictionary* 107 (10th Ed.2014) (defining "animus" in relevant part as "[i]ntention"). The determination of whether or not offenses are allied offenses of similar import is reviewed de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 26-28.

{¶ 17} In this case, there was a single victim and the course of the assault (a beating that took place in a single room albeit over a substantial period of time) was such that ordinarily, the offenses would not necessarily be said to have been committed separately. We recognize that the Supreme Court has (albeit prior to *Ruff*) merged multiple felonious assault counts for shooting the same victim more than once with the same animus or stabbing the same victim more than once with the same animus. *State v. Harris*, 122 Ohio St.3d 373, 2009-Ohio-3323, ¶ 3-4, 18-20, citing *State v. Cotton*, 120 Ohio St.3d 321, 2008-Ohio-6249. Post *Ruff* cases are generally given similar effect. *See State v. Welninski*, 6th Dist. No. WD-16-039, 2018-Ohio-778, ¶ 89-99 (collecting cases). In accordance with this precedent, we acknowledge that, for some altercations, it may not be appropriate to impose an assault charge for each punch thrown.

{¶ 18} However, this is not the typical case. Here we find that hitting D.M. savagely and strangling her to unconsciousness are two actions that each telegraphed different intentions or purposes. The former seems to have been intended to inflict blunt-force trauma, perhaps to cause pain and physical damage. The latter seems to have been

---

[1] Note, *Vazirani* was overruled on other grounds by *State v. Rance*, 85 Ohio St.3d 632, 637 (1999) which has, itself, been overruled by a line of cases culminating in *Ruff*. *See State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314; *Williams*, 2012-Ohio-5699; *Ruff*, 2015-Ohio-995. Despite the many revisions of allied offenses law, there is no indication that the Supreme Court has altered the definition of "animus."

purposed to deprive oxygen and, at a minimum, to render unconscious. We recognize that, in a broad sense, both acts seem to have been driven by the single vile urge to dominate and hurt D.M. Nor are their effects completely distinct—enough blunt-force physical damage results in death which stops breathing and enough oxygen deprivation causes tissue damage and death. Yet, on the facts of this case, we find the transition from abusive hitting to strangling, signals a shift in intention from merely causing pain and venting anger to the intention to silence, perhaps forever. On the facts of this case, these are (as the trial court found) different animuses.

{¶ 19} We also find that different harms resulted from these two forms of attack. While both caused physical harm in the broad sense, the experience of being struck forcefully and repeatedly is quite different from the feeling of having one's airway cutoff. Both are uniquely harmful, psychologically and physically, and both in fact caused differing serious injuries in this case. The former caused fractures and extreme bruising while the latter caused ligature marks, unconsciousness, and what the victim described to the police in her second interview as, "he was killing me, I thought he did kill me." (State's Ex. A at 4.)

{¶ 20} Although the victim was the same and the occasion was the same, the method of attacks (and thus the purposes) and the harms and injuries produced, were different in this case. Or, in the language of *Ruff*, the "conduct shows that the offenses were committed with separate animus" and the harm that resulted from each of the two felonious assault counts was "separate and identifiable." *Ruff* at paragraphs two and three of the syllabus. Hence, Smith was legally convicted and sentenced on both offenses. Smith's first assignment of error is overruled.

### B. Second Assignment of Error – Whether the Defendant was Deprived of a Fundamentally Fair Sentencing Hearing

#### 1. Whether the Prosecution Submitted False Evidence

{¶ 21} It has long been recognized that the duty of a prosecutor is not to seek victory, but to seek justice. As the United States Supreme Court has put it:

> [A prosecutor] is the representative not of an ordinary party to
> a controversy, but of a sovereignty whose obligation to govern
> impartially is as compelling as its obligation to govern at all;
> and whose interest, therefore, in a criminal prosecution is not
> that it shall win a case, but that justice shall be done. As such,
> he is in a peculiar and very definite sense the servant of the law,

> the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.

*Berger v. United States*, 295 U.S. 78, 88 (1935).  Making a false factual statement to a judge that an attorney knows to be false, would be such a "foul blow."  *See, e.g.*, Prof.Cond.R. 3.3(a).

{¶ 22}  However, we see no evidence in this case that the prosecution has uttered any knowing falsity.  The police report contained in State's Exhibit A includes two interview summaries by D.M. in which she recounts the events of the beating in much the same way as the prosecution's memorandum does and in much the same way as the prosecution did at the sentencing.  *Compare* State's Ex. A in passim *with* May 18, 2018 Sentencing Memo. at 1-2 *and* Sentencing Tr. at 9-11.  Though Smith faults the prosecution for not acknowledging D.M.'s shifting stories and the relatively minor differences between the first and second interviews  (Smith's Brief at 28), the prosecution did indicate during sentencing that its view of the case was based on the narrative D.M. "initially" provided to the police.  (Sentencing Tr. at 9.)  Moreover, the prosecution provided the full report and both interview summaries to the trial court.  (State's Ex. A.)

{¶ 23}  The exhibits provided do not substantiate (or contradict) the prosecution's claim about what the defendant said upon arrest, or, for example, that the victim suffered a broken hand.  However, at the plea hearing that occurred approximately six weeks before sentencing, the prosecutor stated the facts of the case as follows:

> Between Wednesday, November 8 of 2017, and Thursday November 9, 2017, the victim identified as [D.M.], was assaulted by the defendant. The officer first made contact with [D.M.] at Grant Hospital where she was being treated for multiple facial fractures, including orbital fractures, nasal bone fractures, and fractures to her wrists and hand. Those fractures did require surgical intervention.
>
> Speaking with [D.M.], she related that she had been assaulted by the defendant over an extensive period of time, she had been strangled multiple times and lost consciousness. Officers did respond to the address where the assault occurred and arrested the defendant.

> When he was being placed under arrest, he did state to the arresting officers, quote, that bitch won't file charges on me, she knows better, just like the last time. This did occur here in Franklin County, Ohio.

(Plea Tr. at 11.)  The defense indicated it had "[n]o exceptions for the purposes of this plea." *Id.* While that wording leaves open the possibility that the defense could and might dispute the facts for other purposes, it falls far short of the sort of protest that the tribunal could have expected (in accordance with an attorney's duty of candor) had any of the facts been whole-cloth fabrications.  Prof.Cond.R. 3.3.

{¶ 24}  At best, Smith's argument that the prosecution presented falsehoods to the tribunal seems to be nothing more than the fact that D.M.'s story changed over time as she got further away from the savage beating she sustained and the psychology of abuse began to take hold.  The prosecution, and for that matter, the tribunal, were fully at liberty to recognize that D.M.'s changing narrative was based on her real or perceived pressure from Smith.  They were free to focus on the statement she gave first to the police, when she was still injured enough and angry enough to tell the truth about her tormentor.  *See* Sentencing Tr. at 18 (trial court remarking, "I have read your presentence report, and I absolutely believe the version of events that was first provided to police officers").

**2. Whether the Trial Court's Emotional Statements in the Case Rendered the Sentencing Unfair**

{¶ 25}  The prosecution suggests that we have held in some of our prior cases that we are without jurisdiction to determine if a common pleas judge has exhibited bias.  (State's Brief at 24-25.)  *See, e.g.*, *State v. Hussein*, 10th Dist. No. 15AP-1093, 2017-Ohio-5519, ¶ 9; *State v. Scruggs*, 10th Dist. No. 02AP-621, 2003-Ohio-2019, ¶ 15.  However, those cases derive from R.C. 2701.03 and *Beer v. Griffith*, 54 Ohio St.2d 440 (1978), which together establish that only the Supreme Court of Ohio may pass on the disqualification of any judge and that a party "may file an affidavit of disqualification with the clerk of the supreme court" if such bias is suspected.  R.C. 2701.03(A).  As consequence, *Beer* concluded that a court of appeals "was without authority to pass upon disqualification or to *void* the judgment of the trial court upon that basis."  (Emphasis added.)  *Beer* at 441-42.  However, even though the state's high court in *Beer* found that a judgment could not be considered "void" by a court of appeals for the reason of judicial bias, a judgment may yet be considered erroneous.  *Id.* at 442; *see, e.g., State v. Corchado*, 7th Dist. No. 16 MA 0155, 2017-Ohio-4390, ¶ 14, citing

*State v. Arnett*, 88 Ohio St.3d 208, 218 (2000); *State v. Power*, 7th Dist. No. 12 CO 14, 2013-Ohio-4254, ¶ 22 (noting that constitutional violations created by bias (such as Due Process violations) are reviewable as errors).

{¶ 26} This is an important distinction. When overlooked or ignored, a defendant may be denied a fair trial or sentencing. Although Ohio allocates the responsibility for voiding judgments and dismissing judges from cases to the Supreme Court of Ohio, still, "[t]he presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis." *State v. Sanders*, 92 Ohio St.3d 245, 278 (2001), citing *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). And the United States Supreme Court has recognized a difference between partiality which may be "proper grounds for appeal," and bias necessary to support "recusal." *Liteky v. United States*, 510 U.S. 540, 555 (1994). However, even the level of partiality or bias necessary for "proper grounds for appeal" rather than for mandatory "recusal," is a very difficult showing for a number of reasons:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. at 583 [(1966)]. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 65 L. Ed. 481, 41 S. Ct. 230 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced

against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Liteky* at 555-56.

{¶ 27} In this case, the judge's comments evince outrage at the crimes, the manipulative conduct, and the flimsy excuses of the defendant. Some of the trial court judge's comments, particularly, "[y]ou are completely offensive to me," and "I have never been so furious," may appear to suggest an above-normal level of emotional involvement. (Sentencing Tr. at 20.)

{¶ 28} Yet, we do not find that such remarks indicated a bias based on an extrajudicial source. Though the exhibits submitted in support of the sentencing memorandum were initially submitted to chambers a few days before the sentencing hearing, they were properly introduced in open court during the sentencing hearing. (Sentencing Tr. at 9.) Nor do we find that the remarks displayed such a degree of antagonism toward the defendant as to make fair judgment impossible. Indeed, after expressing her personal outrage at the defendant's genuinely outrageous conduct, the judge proceeded to consider and apply each of the sentencing factors with exactitude. (Sentencing Tr. at 20-28.) The judge then imposed a sentence that was consistent with the sentencing factors and her findings on the topic of consecutive sentences. (Sentencing Tr. at 28-31.)

### 3. Whether the Trial Court Erred in Curtailing Smith's Mutual Combat Argument

{¶ 29} Crim.R. 32 requires that "[a]t the time of imposing sentence, the court shall * * * address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." Crim.R. 32(A)(1). "If the court imposes sentence without affording the defendant an opportunity to allocute, then resentencing is required unless the error was invited or harmless." *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 200, citing *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 179; *see also State v. Campbell*, 90 Ohio St.3d 320 (2000), paragraph three of the syllabus.

{¶ 30} Smith argues that the trial court deprived him of his right to allocute and argue the sentencing factors when it cut short his attempts to argue that he and D.M. had been engaged in mutual aggression and that this was not a one-sided assault. (Smith's Brief at 34-35.) He points to two statements by the trial court:

> I'm not interested in hearing about your argument of mutual combat * * *.
>
> * * *
>
> I don't want you to say anything else to me to attempt to justify your physical brutality. I don't want to hear it. There is no excuse.

(Sentencing Tr. at 19; Smith's Brief at 35.)

{¶ 31} Though Smith acknowledges that the trial judge allowed him to make a statement in mitigation (Smith's Brief at 34), he fails to acknowledge that his statement included material on exactly the same mutual combat argument:

> [SMITH]: We were into an altercation, Your Honor. This was not just a one-way street. This was both ways.
>
> THE COURT: Were you injured?
>
> [SMITH]: Yes, ma'am. I did have injuries.
>
> THE COURT: What were your injuries?
>
> [SMITH]: I had injuries to my face. I had scratches on my lips.
>
> THE COURT: Was she charged?
>
> [SMITH]: No, ma'am. I never brought those as charges up.
>
> THE COURT: Oh, okay. Why didn't you?
>
> [SMITH]: I just didn't.
>
> THE COURT: So they're not before me. If she's not been charged or convicted --
>
> [SMITH]: Okay.
>
> THE COURT: -- I'm not interested in hearing what may have happened to you.

> [SMITH]: Okay. Ms. Cocroft, those charges -- the injuries are in the discovery package.
>
> THE COURT: So you plead guilty to two counts of felonious assault. You have now conceded to this Court by your circling of these photos that you did cause serious physical harm to [D.M.], so I'm trying to figure out at this point what you're debating with me.
>
> [SMITH]: I'm -- I'm saying -- I'm not debating with you, Ms. Cocroft. I'm just saying that all of those injuries weren't my fault, and we got into it together. That's what I'm saying.
>
> THE COURT: Is there anything else that you want to say to me.
>
> [SMITH]: No, ma'am.

(Sentencing Tr. at 15-16.)  In short, the trial court allowed Smith to make a statement and engaged with him on his mutual combat argument.  It was only later, when Smith interrupted the trial court's pronouncement of sentence in order to repeat the argument that the court refused to hear him further.  The trial court did not prevent Smith from allocuting or refuse to hear his argument of mutual combat.  It just refused to hear it repetitively.  We find no error in that.

{¶ 32} Having considered and rejected all three branches of Smith's second assignment of error, we overrule it.

### C. Third Assignment of Error – Whether the Trial Court Failed to Make the Necessary Findings to Sentence Smith Consecutively

{¶ 33} In Ohio, there is a broad presumption against consecutive sentencing. R.C. 2929.41(A).  However, that presumption is overcome and consecutive sentences may be imposed if consecutive sentences are agreed to by the defendant or mandatory.  *See State v. Sergent*, 148 Ohio St.3d 94, 2016-Ohio-2696, ¶ 43; *State v. Alexander*, 10th Dist. No. 16AP-761, 2017-Ohio-4196, ¶ 9; *see also, e.g.*, R.C. 2929.14(B)(2)(d) and (C)(1-3, 5-6).  In cases where consecutive sentences are discretionary and not agreed to by the defendant, in order to overcome the presumption against consecutive sentences, the trial court must first make the findings set forth in R.C. 2929.14(C)(4):

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the

public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 34} The trial court must make the R.C. 2929.14(C)(4) findings at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings nor must it recite certain talismanic words or phrases in order to be considered to have complied. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus; *State v. Howze*, 10th Dist. No. 13AP-386, 2013-Ohio-4800, ¶ 18. Yet, "sentencing consecutively without first overcoming the presumption that sentences are to be imposed concurrently 'is contrary to law and constitutes plain error.' " *State v. Greene*, 10th Dist. No. 17AP-667, 2018-Ohio-3135, ¶ 15, quoting *State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 18; *State v. Boynton*, 10th Dist. No. 12AP-975, 2013-Ohio-3794, ¶ 12; *State v. Wilson*, 10th Dist. No. 12AP-551, 2013-Ohio-1520, ¶ 18.

{¶ 35} In this case, the trial court found that Smith's assaults against D.M. were more serious forms of these offenses, that Smith was a danger to the community, and was likely to reoffend. (Sentencing Tr. at 21-28, 31.) While not a talismanic recitation of the statute, this shows the trial court considered whether "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the

danger the offender poses to the public," and having indicated it had done this, the trial court concluded that consecutive service was necessary. R.C. 2929.14(C)(4). The trial court also found Smith's criminal history of abusing women to be a factor making it likely he would reoffend. (Sentencing Tr. at 27-28.) This is sufficient to show the court considered R.C. 2929.14(C)(4)(c) to be satisfied. Finally, it was abundantly clear from the trial court's statements throughout the sentencing hearing that it felt that the severity of D.M.'s injuries was such that the harm caused by the offenses was so great or unusual that no single prison term would have adequately reflected the seriousness of Smith's conduct. (Sentencing Tr. at 19, 22-23, 30.) R.C. 2929.14(C)(4)(b). The trial court also included these specific statutory findings in its judgment entry. (May 30, 2018 Jgmt. Entry at 2.)

{¶ 36} Smith's third assignment of error is overruled.

### D. Fourth Assignment of Error – Whether Trial Counsel Rendered Ineffective Assistance in Relation to Smith's Sentencing

{¶ 37} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "In evaluating counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). "To show prejudice, the appellant must establish that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Roush* at ¶ 37, quoting *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 204; *see also Strickland* at 694. The failure to make either showing (deficient performance or prejudice) defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 (" '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' ").

{¶ 38} Smith offers essentially four arguments for how his trial attorney fell below the constitutionally required standard of effectiveness in relation to sentencing.  First, he argues that defense counsel failed to challenge the prosecutor's false assertion in the sentencing memorandum that the beating lasted eight and one-half hours.  (Smith's Brief at 38-39.)  Second, trial counsel failed to object to the submission of sentencing exhibits to chambers. *Id.* at 39-40.   Third, counsel failed to adequately develop mitigating circumstances to present.  *Id.* at 40.   Fourth, defense counsel was passive in his presentation. *Id.* at 40-41.  We address these in order.

{¶ 39} The prosecution memorandum does not indicate that the assault lasted eight and one-half hours.  The prosecution stated in its memorandum that D.M. told the police that the assaults began at 9:00 p.m. and lasted until she called the police the following morning at 5:22 a.m., which is an accurate description of what is in the police report. (May 18, 2018 Sentencing Memo. at 3; State's Ex. A at 2-3.)   The fact that D.M. later contradicted it in her second statement and again at the sentencing hearing does not automatically make the initial statement false and her later recantations true, nor has the prosecution offered the court falsehoods.  While the defense could have chosen to greater emphasize D.M.'s shifting narrative, such a strategy could also have easily been perceived as manipulative and a further example of the history of domestic violence against the victim by Smith.  This may have been a strategy employed by Smith's counsel at the trial court level, letting D.M.'s later conflicting statements speak for themselves.

{¶ 40} Perhaps Smith's counsel should have objected to the prosecution submitting the exhibits directly to chambers days before sentencing rather than filing them.  Although medical records are exempted from the general e-filing requirement by section I of the Court of Common Pleas' Fourth Amended Administrative Order (15MS-216), an exception from the e-filing requirement does not mean that an entire exhibit should not be docketed and filed at all.  Moreover, not all of the exhibits were medical records.  Some were photographs and some were police reports.  In short, if D.M.'s privacy had been the driving concern, rather than submitting the exhibits directly to chambers, the prosecutor could have conferred with the defense and the court to coordinate filing the records under seal or an appropriate protective order.  *See* Crim.R. 57(B); Civ.R. 26(C).  This could have been objected to.  Nevertheless, given that the exhibits were introduced during the sentencing

hearing and made available to the defense in discovery, we do not see any reasonable probability that the result of the sentencing hearing would have been different had the defense objected to the provision of such exhibits to chambers rather than by formal filing. The supposition, advanced by Smith, that the trial judge "dwell[ed]" on the exhibits for four days prior to the sentencing hearing is not supported by the record and does not take account of the fact that Smith's case was one of many on the trial court's busy schedule. (Smith's Brief at 39-40.)

{¶ 41} Other than hints about intoxication and what other medical records could have shown about D.M.'s condition, Smith does not (and cannot, in a direct appeal) present any indication of significant mitigating evidence that defense counsel could have discovered and presented but failed to present. Thus, he cannot show either that defense counsel was deficient in failing to discover any hypothetical mitigation or that the mitigation stood a reasonable probability of altering the result had it been discovered and presented. Arguments such as this rely on evidence outside the record and are therefore not appropriately argued on direct appeal. " 'A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *State v. Oteng*, 10th Dist. No. 18AP-58, 2018-Ohio-3138, ¶ 25, quoting *State v. White*, 10th Dist. No. 14AP-160, 2015-Ohio-5365, ¶ 11; *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, ¶ 13; *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus.

{¶ 42} While "passive" may be a fair descriptor of defense counsel's presentation during the sentencing hearing, we cannot say that a different approach would have been a better strategy or would have had a reasonable probability of leading to a different outcome. Smith posits that if defense counsel had crafted D.M.'s recantation into a memorandum, argued his suitability for CBCF,[2] and "advocated zealously for his client, the outcome surely would have been a more favorable sentence." (Smith Brief at 41-42.) We disagree. D.M.'s recantation, even through the sterilizing lens of a written transcript, is rambling, broken, and dissociative. The pictures of her face speak volumes to how savagely she was beaten. (State's Ex. C.) Crafting a full sentencing presentation around her startling attempt to protect her tormentor would likely, if anything, have more aptly demonstrated the toxicity

---

[2] Community based correction facility.

of the relationship to the sentencing judge, who was clearly familiar with patterns of domestic violence that were visible at Smith's sentencing between the perpetrator and the victim. Suitability for CBCF, while a potentially useful data point, is not legally a substitute for the trial court's review of the statutory sentencing factors (most of which were against Smith). And references to "zealous" advocacy have been omitted from the Ohio Rules of Professional Conduct "because 'zeal' is often invoked as an excuse for unprofessional behavior." Prof.Cond.R. 1.3 (Comparison to former Ohio Code of Professional Responsibility). Smith's counsel may have recognized as useful a strategy of being reserved in a delicate case and arguing only points that are vulnerable to yield better results than blind zealotry in defense of recognizable patterns of domestic violence that are indefensible.

{¶ 43} We do not find that defense counsel was ineffective. Smith's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 44} Because the methods of Smith's assaults against D.M. demonstrated varying animuses for his actions and inflicted harms that were separate and identifiable, we agree with the trial court that they were not allied offenses. While we acknowledge an above-normal level of emotional investment in the case on the part of the trial judge, we do not find that the sentencing was rendered unfair by it. The trial judge made all necessary and appropriate findings in supporting the sentence imposed. Finally, we conclude that Smith's trial counsel was not ineffective. Accordingly, we overrule all four of Smith's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

LUPER SCHUSTER, J., concurring.

{¶ 45} While I concur in the judgment of the majority overruling Smith's four assignments of error, I write separately to clarify my reasoning as to Smith's first, second, and fourth assignments of error.

{¶ 46} In his first assignment of error, Smith argues the trial court erred in failing to merge the two counts of felonious assault for purposes of sentencing. The majority states that the offenses here cannot be said to have been committed separately because they occurred in a single room over a substantial period of time, and the majority further states

that "in the average altercation, it would not be appropriate to impose an assault charge for each punch thrown." (Majority at ¶ 17.) I do not agree with the majority that the case law necessarily compels the conclusion that the two offenses of felonious assault here cannot be said to have been committed separately merely because they occurred in the same room. Further, I do not agree with the majority's characterization of any criminal offense as fitting a prototype of an "average altercation," and I am concerned about the use of broad generalizations being applied to facts not before this court in the instant matter.

{¶ 47} I would not reach the issue of whether the offenses in this case were committed separately. *See State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 25 (noting that if *any* of prongs of the three-part allied offense test is true, the offenses do not merge). Instead, I would confine my analysis to whether there was separate harm. Because I agree with the majority that the harm from the blunt force attack was separate from the harm inflicted by the strangulation, I would conclude the offenses are of dissimilar import in that "each offense caused separate, identifiable harm." *Ruff* at ¶ 25. Having satisfied the first prong of the *Ruff* test, I would end the analysis of Smith's merger argument at this point and overrule his first assignment of error on that basis.

{¶ 48} As to Smith's second assignment of error, the majority concludes under the second prong of this assignment of error that Smith has properly raised the issue of judicial bias and that this court may review that claim. Although the majority ultimately concludes Smith did not demonstrate a case of judicial bias and overruled his assignment of error on that basis, I would not depart from the line of cases of this court holding that, "pursuant to R.C. 2701.03, the Supreme Court of Ohio, not the appeals courts, has authority to determine a claim that a common pleas court judge is biased or prejudiced." *State v. Hussein*, 10th Dist. No. 15AP-1093, 2017-Ohio-5519, ¶ 9; *State v. Scruggs*, 10th Dist. No. 02AP-621, 2003-Ohio-2019, ¶ 15 ("an appellate court is without authority to pass upon issues of disqualification or to void a judgment on the basis that a judge should be disqualified for bias or prejudice"). Thus, I would overrule Smith's second prong of his second assignment of error on the grounds that he did not invoke the jurisdiction of the proper court to review his claim of bias. *Hussein* at ¶ 9. Additionally, I do not agree with the majority's statement that the trial court displayed "an above-normal level of emotional involvement" in this case. (Majority at ¶ 27.)

**{¶ 49}** In Smith's third assignment of error, he argues, in part, that his trial counsel was ineffective in failing to object to the submission of sentencing exhibits directly to chambers.  I do not agree with the majority's statement that "it was not fair practice and could even be sanctionable for the prosecution to have submitted the exhibits directly to chambers." (Majority at ¶ 40.)  Rather than opine, as the majority does, about the propriety of the state's actions in submitting the exhibits, I would instead confine my analysis to the conduct of Smith's counsel as this claim is one for ineffective assistance of counsel.

**{¶ 50}** Under the rubric of ineffective assistance of counsel, I would note that counsel's decision whether or not to object is a matter of trial strategy, and on appeal, we consider whether such an objection would have been meritorious.  *State v. Hodson*, 10th Dist. No. 18AP-242, 2019-Ohio-1734, ¶ 46.  Given that (1) Smith does not provide any citation supporting his position that the submission of exhibits was error, (2) the exhibits were made available to defense counsel and introduced during the sentencing hearing, and (3) trial courts are afforded considerable latitude in what they may consider during the sentencing phase pursuant to R.C. 2929.19, I would conclude Smith does not demonstrate deficient performance under the first prong of the *Strickland* analysis related to his counsel's failure to object to the state's method of submission of the exhibits to the trial court.  *See State v. Ali*, 10th Dist. No. 18AP-935, 2019-Ohio-3864, ¶ 12 (noting "R.C. 2929.19 permits a trial court to consider 'information relevant to the imposition of sentence' in crafting an appropriate sentence").

**{¶ 51}** For these reasons, I concur separately.