[Cite as *State v. Oteng*, 2018-Ohio-3138.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-58 |
| v. | : | (C.P.C. No. 13CR-224) |
| Dennis Oteng, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 7, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Dennis Oteng*, pro se.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Dennis Oteng, who is presently serving a sentence of 18 years to life for the shooting death of Kingsley Owusu, appeals an order of the Franklin County Court of Common Pleas entered on January 3, 2018 without a hearing, denying his petition for postconviction relief, and denying his motion for leave to amend the petition. Because the evidence at trial was conflicting, testimony from an eyewitness to the shooting that Oteng was not the shooter would have been important. Accordingly, we find that the trial court acted unreasonably when it summarily denied Oteng's motion for leave to amend his postconviction petition with an affidavit from that witness. We sustain Oteng's second assignment of error. We also find res judicata does not prevent Oteng from arguing that his trial counsel was ineffective because the particular reasons for his allegation rely on evidence outside the original trial record, not subject to review on direct appeal. We

additionally sustain in part Oteng's first assignment of error, holding the remainder of it moot because of our holding on Oteng's second assignment of error.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On January 15, 2013, a Franklin County Grand Jury indicted Oteng for the murder of Kingsley Owusu. (Jan. 15, 2013 Indictment.) The Grand Jury's finding was based on two alternative charges, murder and felony murder, each with a firearm specification. *Id.* Oteng pled not guilty on January 18, 2013. (Jan. 18, 2013 Plea Form.)

{¶ 3} During the month of April 2014, the trial court held a jury trial on the case. In a later-issued appellate decision, we recounted the facts of the case as presented at trial:

> In the early morning hours of January 5, 2013, Kingsley Owusu was shot and killed in the parking lot of the Filipino Center on Westerville Road in Columbus, Ohio. The victim's best friend, Benjamin Appiah, described the events that lead to Owusu's death as follows. In the late evening of January 4, 2013, Owusu and his friend Gab[riel Basoah], also known as G-money, picked him up at home and traveled to Lounge 62 in Westerville. When they arrived at Lounge 62, they ran into a friend by the name of David Aseidu who was at the lounge with his friend Andrea d'Almeida. Appiah testified that he and all these other individuals [hail] from the West African nation of Ghana. He described the Ghanaian community in Columbus as a fairly tight knit group, and he stated that most members of the community know each other.
>
> At Aseidu's suggestion, the group of five left Lounge 62 and headed to the Filipino Center to attend a New Year's party co-hosted by Appiah's former girlfriend, Alexis Wellington, and her best friend, Helen Mamo. According to Appiah, he and Wellington had dated "on and off" for approximately one and one-half years prior to that time. (Tr. 335.) Appiah was also aware that appellant was the father of Wellington's six year old daughter, Michelle.
>
> When they arrived at the party, [Basoah] parked his vehicle at the back of the parking lot. Aseidu, who was traveling with d'Almeida, parked their vehicle closer to the main entrance of the Filipino Center. Appiah testified that he exited the vehicle and began walking toward the main entrance, just behind Owusu and [Basoah]. As [Basoah] and Owusu crossed the parking lot, a man by the name of Yaw Boayke confronted Owusu and began yelling at him in an "angry tone." (Tr. 353.) [Basoah] stepped between the two and then struck Boayke in

the face with his forehead. The two men fell to the ground wrestling before Appiah was able to pull [Basoah] off of Boayke.

When Boayke returned to the Filipino Center, he was bleeding from the mouth, and he told Mamo that [Basoah] had head-butted him. By this time, Appiah had entered the Filipino Center to check out the party, while [Basoah] and Owusu waited outside. Appiah then saw appellant and "his crew" of four or five men rush past him toward the parking lot. (Tr. 371.) Appiah recognized a man he knew as Daniel, also known as D.J., and another man he knew as Stevenson following appellant out the main entrance.

At that point, Appiah went out to the parking lot where he saw appellant approaching Owusu with a handgun raised and pointed at him. Appiah got between Owusu and appellant in an effort to diffuse the situation. When he turned away from appellant to face Owusu, he saw that Owusu was holding a small handgun. Appiah pleaded with his friend to give him the gun. He told Owusu "[l]et's just leave the scene." (Tr. 370.) According to Appiah, Owusu handed him the gun.

At that moment, Appiah heard a gun shot ring out behind him, and he began running toward the main entrance of the Filipino Center to get away. When he reached the entrance, he realized Owusu was not with him. Concerned for his friend, Appiah turned to head back outside, but he was momentarily delayed by a security guard. When Appiah made it outside, he saw appellant and Owusu facing one another about arms length apart with appellant pointing a handgun at Owusu. Appiah testified that he was standing about ten feet away from the two men with a clear view when he saw appellant fire a shot at Owusu.

According to Appiah, the shot struck [Owusu] in the upper body, and he immediately fell to the ground. Appellant then rushed over to Owusu and began kicking him in the head. When appellant broke off his assault and ran, Appiah tried to fire a shot from Owusu's gun, but it jammed. Appiah ejected two live shells from the gun and then began running after appellant, shooting the gun in the air as appellant fled the parking lot in his black BMW.

Owusu died as a result of a single gunshot wound to the chest. Columbus Police arrested appellant on January 6, 2013, at the home of his friend Kwame Kusi.

*State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 2-9. For the purposes of this decision, we also note a number of facts presented by evidence at trial that were not included in the prior panel's recitation.

{¶ 4} The police recovered a single .38o handgun, two live .380 rounds, six spent 9 mm shell casings, and two spent .380 casings at the scene. (State's Ex. A; State's Ex. A-1.) Ballistics analysis revealed that two 9 mm casings were ejected by one firearm, four 9 mm casings were ejected from another, and the two .380 casings were spent by a third weapon. (Tr. at 318; State's Ex. S-2.) The .380 casings could neither be excluded nor identified as having been fired in the gun recovered at the scene (which Appiah testified was the one he used). (Tr. at 317, 320, 395; State's Ex. S-2; State's Ex. A-1.) That gun also did not fire the fatal bullet recovered from Owusu's body. (Tr. at 317, 320; State's Ex. S-1.)

{¶ 5} Appiah was the only witness (out of 19 State's witnesses) who testified that he saw Oteng shoot Owusu. (Tr. at 375-76.) Appiah admitted that he initially lied to the police about whether he possessed and fired a gun on the night of the shooting. (Tr. at 394-97.) He explained that he lied because he was on probation. (Tr. at 396-97.) Although Appiah testified that Oteng was standing squarely in front of Owusu when Oteng fired, the coroner testified that Owusu was shot in the shoulder from the right side at a slightly downward angle. (Tr. at 416-20, 469-70.) The coroner explained that the bullet passed through the right shoulder at a downward angle into the right pleural cavity, passed right to left through the fifth thoracic vertebra inflicting a crush injury to the spinal cord, then punctured the left lung, and came to rest in the left pleural space. (Tr. at 449-50, Autopsy Report at 2, introduced as part of State's Ex. P.)

{¶ 6} Basoah, Boayke, and Appiah were all tested for gunshot residue ("GSR") the evening of the shooting and all three tested positive. (Tr. at 76-77, 104-05, 745-47; State's Ex. R-1.) Testimony established that Oteng fled immediately in his BMW and the BMW was recovered the next day. (Tr. at 151, 160-63, 389.) But even though testimony also established that GSR could have been transferred to the car by Oteng's touch and even though testimony of an expert suggested that it would have lingered within the car until the car was cleaned or driven with the windows down, the BMW was not tested for GSR. (Tr. at 151, 160-63, 752-55, 788.) Oteng's clothing was tested and tested negative for GSR. (Tr. at 762; State's Ex. R-2.)

{¶ 7} Other than Appiah, five lay witnesses testified about the events on the evening Owusu was shot. One witness testified that he heard the shooting but did not see it. (Tr. at 192-93.) He said that he put on his glasses and looked out of his van after he heard the shots. *Id.* He saw a man with a gun kicking someone lying on the ground but explained that he could not identify anyone because it was too dark. *Id.* Another witness, who saw the confrontation from about 12 feet away, testified that Oteng was the one kicking Owusu in the head as Owusu lay prostrate. (Tr. at 255-56, 274.) But that same witness testified that she saw both of Oteng's hands during and after the kicking and he was not holding a gun. (Tr. at 276-78, 280-82.) Another witness testified that both Oteng and Appiah shot their guns before Owusu was shot and that she did not know who shot Owusu. (Tr. at 553, 570.) A final witness indicated she was inside when the shooting happened and did not see any shots fired. (Tr. at 638-39.) She indicated that someone she knew as "Daniel" or "DJ" screamed to Oteng, "you shot him, get in the car." (Tr. at 644, 647-48.) However, she admitted when she was initially interviewed by the police in the aftermath of the shooting, she told the police at least four times that Basoah was the only one who had been shooting a gun and she did not mention DJ's alleged exclamation. (Tr. at 697-98, 724-29.) A final witness testified that he had warned Oteng not to go to the party because he knew Oteng and Owusu were not on good terms. (Tr. at 813-14.) He said Oteng telephoned him at 2 a.m. on the night of the shooting and said that he had "shot him," which the witness assumed meant that Oteng was confessing to having shot Owusu. (Tr. at 816-18.) The witness went on to testify, however, that when he saw Oteng in person the next evening, Oteng asserted that a lot of people had been shooting at the party and that he did not shoot Owusu. (Tr. at 821-23, 833.)

{¶ 8} On April 24, 2014, a jury found Oteng guilty of all counts. (Apr. 24, 2014 Verdict Forms.) During a May sentencing hearing, the trial court merged the two murder and felony murder counts and sentenced Oteng to serve 15 years to life for murder plus 3 consecutive years for the firearm specification, for a total sentence of 18 years to life in prison. (Tr. at 988, 990; May 14, 2014 Jgmt. Entry at 2.)

{¶ 9} Oteng appealed. (June 11, 2014 Notice of Appeal.) Transcripts were prepared and filed on August 25, 2014. In his appeal, Oteng raised ten assignments of error. *Oteng* at ¶ 12. Among other arguments, Oteng maintained that his trial counsel had performed

ineffectively due to a failure to review certain jail calls, failure to insist upon the employment of an interpreter to translate jail calls for the jury, failure to object to hearsay testimony, and failure to object to improper comments and questions by the prosecutor. *Id.* at ¶ 86-92. In a decision issued on March 31, 2015, a panel of this Court overruled all his assignments of error, including the ineffective assistance of counsel arguments, and affirmed the conviction. *Id.* in passim.

{¶ 10} After litigation of a motion for a new trial and an attempted appeal to the Supreme Court of Ohio, Oteng filed on August 17, 2017 a postconviction petition to vacate or set aside his conviction. (Aug. 17, 2017 Postconviction Petition.) In it, Oteng asserted a single claim, that he was deprived of his right to conflict-free counsel when his trial counsel, Javier Armengau, represented him despite an undisclosed conflict of interest. *Id.* Specifically, Oteng argued that because Armengau had been indicted for several serious offenses, Armengau would not have wished to defend Oteng vigorously due to a desire to curry favor with the State. *Id.* Oteng supported his petition with his own affidavit swearing that the contents of his petition were true and correct, as well as copies of Armengau's 2013 indictment, a 2014 judgment entry sentencing Armengau to prison, and an article published on July 7, 2017, reporting on a decision issued by this Court on June 22, 2017 affirming in part and reversing in part Armengau's conviction. (Aug. 17, 2017 Postconviction Petition at 9, Exs. A-C.) Oteng acknowledged that his petition was filed beyond the time provided for by statute, but stated that he was unaware of Armengau's legal troubles until (on July 10) he saw the July 7, 2017 article reporting on this Court's appellate decision in Armengau's case. (Aug. 17, 2017 Postconviction Petition at 8.)

{¶ 11} Plaintiff-appellee, State of Ohio, responded and Oteng replied. (Aug. 28, 2017 Memo. in Opp.; Sept. 14, 2017 Reply.) Then, more than four months following the initial petition, Oteng filed a motion for leave to amend his postconviction petition. (Jan 3, 2018 Mot. for Leave to Amend.) Oteng's motion for leave included a copy of the proposed amended petition and exhibits in support thereof in which Oteng sought to assert new evidence of Armengau's alleged ineffectiveness. Specifically, in addition to his own affidavit and attachments regarding Armengau's criminal case, Oteng attached an affidavit of Seth Mensah in which Mensah swore that he personally witnessed the shooting. (Jan. 3, 2018 Am. Petition, attached to Jan. 3, 2018 Mot. for Leave.) Mensah averred that "[t]he person

who shot Mr. Owusu was not Dennis Oteng. I did not even see Mr. Oteng with a firearm." (Mensah Aff., Ex. D. to Jan. 3, 2018 Am. Petition.) Mensah stated that the shootout was between "G-Money [Basoah] and Ben Appiah" and that Oteng was inside the Filipino Center when the shooting occurred. *Id.* Mensah further averred that he told the police this information and that he had attempted to contact Armengau but his contact attempts had gone unanswered. *Id.*

{¶ 12} Later on the same day in which Oteng filed his motion for leave to amend, the trial court issued a decision denying his initial petition without a hearing. (Jan. 3, 2018 Decision & Entry.) The decision did not mention or explicitly decide Oteng's motion for leave to amend. The trial court found that Oteng should have raised the issue of Armengau's conflict in his direct appeal and therefore that it was barred by res judicata. *Id.* at 5-6. However, the trial court also decided that, even were that not the case, Oteng had failed to sufficiently substantiate his claims to merit a hearing. *Id.* at 6-8.

{¶ 13} Oteng now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 14} Oteng alleges two assignments of error for review:

> [1.] THE TRIAL COURT ERRED IN DENYING APPELLANT'S PETITION FOR POST-CONVICTION RELIWF [sic] WITHOUT A HEARING THEREBY DENYING HIM THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND CONFLICT FREE REPRESENTATION GUARNTEED [sic] BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION TEN, OF THE OHIO CONSTITUTION.
>
> [2.] THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION TO AMEND HIS POST-CONVICTION PETITION.

## III.  DISCUSSION

### A.  Second Assignment of Error – Whether the Trial Court Erred in Denying Oteng's Motion for Leave to Amend

{¶ 15} Except in the case of a person who has been sentenced to death, after a response to a petition for postconviction relief has been filed, a petitioner may only amend a petition with leave of the court. R.C. 2953.21(G)(3). While the trial court in this case did not expressly deny Oteng's motion for leave to amend, when a trial court enters judgment

without expressly determining a pending motion (including a motion for leave to amend a postconviction petition), the motion is considered to be overruled by implication. *State v. Young*, 10th Dist. No. 05AP-641, 2006-Ohio-1165, ¶ 27. A decision (even an implied decision) on a motion for leave to amend is reviewed for abuse of discretion. *Id.* at ¶ 28.

{¶ 16} In this case, the original petition for postconviction relief was fully briefed when the State filed in opposition on August 28, 2017, and Oteng replied on September 14, 2017. (Aug. 28, 2017 Memo. Contra; Sept. 14, 2017 Reply.) According to Oteng, not until November 2017 did he become aware of the fact that Mensah had tried to approach his counsel, Armengau. (Jan. 3, 2018 Am. Petition at 8-9.) Oteng then filed his motion for leave with the affidavit of Mensah on January 3, 2018. (Jan. 3, 2018 Mot. for Leave.)

{¶ 17} In this case, there was considerable disagreement between the witnesses at trial as to what happened and, in some cases, between their statements to the police and their testimony at trial. *See supra,* at ¶ 5, 7. The only witness to accuse the defendant of the shooting (Appiah) admitted that he initially lied to the police about his role and the testimony he gave at trial was at least in tension (if not in direct conflict) with the physical evidence observed by the police and coroner. *See supra*, at ¶ 5-6. No forensic evidence was discovered to suggest that Oteng fired the fatal shot or, indeed, that he shot or held a gun at all. *See supra*, at ¶ 6. In those circumstances, the sworn statement of another eyewitness stating that Oteng was not the shooter would have been important evidence for the jury to consider. Mensah in his affidavit asserts that Armengau did not respond to Mensah's attempts to contact him and Oteng's submissions regarding Armengau's own personal criminal proceedings lend credence to the notion that Armengau may have been too engulfed by his own situation to adequately respond to information regarding Oteng's case. Under these circumstances, we find it was unreasonable for the trial court to have entirely failed to consider Oteng's motion for leave to amend and to have therefore implicitly and summarily denied it. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983) (noting that an "unreasonable" decision of the trial court may constitute an abuse of discretion).

{¶ 18} On these specific facts, we find the trial court abused its discretion in denying Oteng's motion for leave to amend. We therefore sustain Oteng's second assignment of error, modify the trial court's judgment so as to grant Oteng's motion to amend his postconviction motion with Mensah's affidavit and related arguments and remand Oteng's

amended postconviction petition to the trial court to reconsider whether or not to grant a hearing on Oteng's amended postconviction petition.

{¶ 19} We note that on remand the issues raised in this assignment of error could be rendered moot if on a potential postconviction hearing the trial court finds that Oteng's arguments about Armengau's efficacy are foreclosed by res judicata.  We thus consider Oteng's first assignment of error to the limited extent that it challenges any res judicata-based denial of Oteng's petition.

### B.  First Assignment of Error – Whether the Trial Court Erred in Denying Oteng's Petition without a Hearing on the Basis of Res Judicata

{¶ 20} The postconviction relief process is a collateral civil attack on a criminal judgment.  *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994).  "It is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained" in the trial court record.  *State v. Murphy*, 10th Dist. No. 00AP-233, 2000 WL 1877526, 2000 Ohio App. LEXIS 6129, *5 (Dec. 26, 2000); *see also, e.g.*, *State v. Carter*, 10th Dist. No. 13AP-4, 2013-Ohio-4058, ¶ 15.

{¶ 21} A defendant is not automatically entitled to an evidentiary hearing on a postconviction relief petition.  *State v. Jackson*, 64 Ohio St.2d 107, 110 (1980).  R.C. 2953.21(D) provides that, "[b]efore granting a hearing on a petition * * * the court shall determine whether there are substantive grounds for relief."  Thus the petitioner bears the initial burden of providing evidence that demonstrates a cognizable claim of constitutional error.  *State v. Ibrahim*, 10th Dist. No. 14AP-355, 2014-Ohio-5307, ¶ 9.  Because the burden is the petitioner's, a postconviction relief petition may be denied without an evidentiary hearing where the petition and supporting materials do not demonstrate that the petitioner set forth sufficient operative facts to establish substantive grounds for relief.  *State v. Calhoun*, 86 Ohio St.3d 279, 282-83 (1999).

{¶ 22} Review of this question is mixed.  *State v. Barber*, 10th Dist. No. 16AP-172, 2017-Ohio-9257, ¶ 17, 20; *cf. State v. Kane*, 10th Dist. No. 16AP-781, 2017-Ohio-7838, ¶ 9. We have recognized that, "in reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact."  *State v. Canada*, 10th Dist. No. 16AP-7, 2016-Ohio-5948, ¶ 17; *see also Calhoun* at 285 (noting

five factors that should be considered before a trial court may exercise its discretion to decline to accept an affidavit as true); *accord State v. Taylor*, 10th Dist. No. 14AP-166, 2014-Ohio-3574, ¶ 23; *Ibrahim* at ¶ 24.

{¶ 23} We review the factual findings of the trial court for compliance with the *Calhoun* analysis and also for whether the trial court abused the "sound exercise of discretion" permitted by *Calhoun*. *Calhoun* at 284; *State v. Campbell*, 10th Dist. No. 03AP-147, 2003-Ohio-6305, ¶ 14. We review questions of law de novo. *Barber* at ¶ 20; *Kane* at ¶ 9.

{¶ 24} A particular question of law for de novo review is whether a petition for postconviction relief should have been dismissed without a hearing because it was barred by the doctrine of res judicata. *Ibrahim* at ¶ 10. In criminal cases, res judicata generally bars a defendant from litigating claims in a proceeding subsequent to the direct appeal "if he or she *raised or could have raised* the issue at the trial that resulted in that judgment of conviction or on an appeal from that judgment." (Emphasis sic.) *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 92; *see also State v. Szefcyk*, 77 Ohio St.3d 93, 95-96 (1996). " 'Stated differently, in criminal cases *res judicata* may preclude issues, arguments, or positions that could have been (even if they were not actually) litigated.' " *State v. Long*, 10th Dist. No. 17AP-845, 2018-Ohio-2372, ¶ 15, quoting *Barber* at ¶ 19. Therefore, notwithstanding the fact that a postconviction petition is a quasi-civil proceeding, "constitutional issues cannot be considered in postconviction proceedings where those issues should have been raised on direct appeal and where the issues may be fairly determined without resort to evidence dehors the record." *Murphy* at *7; *State v. Cole*, 2 Ohio St.3d 112 (1982), syllabus; *State v. Nichols*, 11 Ohio St.3d 40, 41-42 (1984).

{¶ 25} In this case, the trial court concluded that the general question of whether or not Armengau was ineffective as Oteng's counsel had been litigated previously and that the information about Armengau's legal troubles was "public information." (Jan. 3, 2018 Decision & Entry at 5.) The trial court decided that even the specific question about whether Armengau's legal difficulties impaired his ability to act as counsel could have been and should have been litigated on direct appeal. *Id.* However, this Court has previously confronted this issue in a case where a defendant (who also had Armengau as his attorney)

attempted to raise in a direct appeal essentially the same arguments Oteng has asserted here.  In that case we held:

> " 'A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, P 13, 818 N.E.2d 1157, quoting *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. Though White's brief asserts facts about Armengau's difficulties, the record in this direct appeal contains no evidence or information whatsoever about Armengau's particular situation. Although White refers to the caption of Armengau's criminal case and the caption of his disciplinary case before the Supreme Court of Ohio, he does not expressly request that we take judicial notice of the same. Nevertheless, even if we were to take judicial notice of the fact that Armengau was indicted for a number of serious criminal offenses before White's trial and was convicted and imprisoned for them after White's trial, the record would still be devoid of any factual details regarding Armengau's licensure issues. Furthermore, there is nothing in the record of this direct appeal indicating White was unaware of Armengau's situation. In short, while we understand White's argument, that his counsel may have been distracted and conflicted by the fact that he was suffering severe legal and personal difficulties at the same time that he was engaged in litigating White's murder trial, *we lack the necessary facts to fully consider such a matter in a direct appeal. A direct appeal, where the record is limited and where the record contains no mention of any of the relevant facts at issue, is not the vehicle to make such an argument.*

(Emphasis added.) *State v. White*, 10th Dist. No. 14AP-160, 2015-Ohio-5365, ¶ 11.

{¶ 26} Information about Armengau's personal legal difficulties is not part of the original trial record in the criminal case of his client, Oteng.  Oteng's argument that his trial counsel's performance or ability to perform was compromised by distraction or conflict as a result of personal legal problems being prosecuted by the same party prosecuting Oteng require evidence outside the trial record.  Despite the public availability of some basic judicially noticeable facts, Oteng's arguments on postconviction petition as a matter of law could not properly be presented by direct appeal.  Thus res judicata does not foreclose Oteng from raising them postconviction.

{¶ 27} We sustain in part Oteng's first assignment of error insofar as we find that the arguments asserted postconviction and as sought to be amended are not foreclosed by res judicata. We find moot the remainder of Oteng's first assignment of error since resolution of his second assignment of error already requires remand for reconsideration of the arguments in Oteng's petition as amended by the affidavit of Seth Mensah.

## IV.  CONCLUSION

{¶ 28} The only direct eyewitness to the shooting, Appiah, offered trial testimony that conflicted with physical evidence and the testimony of other witnesses. Testimony from a second direct eyewitness to the shooting could have been important to the outcome of Oteng's criminal trial. According to Mensah's affidavit, such testimony was available but was ignored by Oteng's trial attorney, Javier Armengau. Based on these circumstances, the trial court acted unreasonably in summarily denying Oteng's motion for leave to amend his postconviction petition with an affidavit from that witness. We sustain Oteng's second assignment of error and modify the trial court's judgment, granting Oteng's motion to amend his postconviction petition. As a matter of law, absent evidence he was unaware of them at the time, res judicata does not bar Oteng from arguing that his trial counsel was ineffective on account of his own personal criminal prosecution by the same party, the State of Ohio, and on account of ignoring communication attempts from an alleged second eyewitness to the shooting, Mensah. These allegations rely on evidence outside the original trial record. They could not have been raised on direct appeal. Accordingly, we sustain in part Oteng's first assignment of error, holding the remainder moot by our resolution of Oteng's second assignment of error.

*Judgment reversed and modified in part, and case remanded.*

TYACK and HORTON, JJ., concur.

_____