[Cite as *State v. Oteng*, 2020-Ohio-6939.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-763 |
| v. | : | (C.P.C. No. 13CR-224) |
| Dennis Oteng, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 29, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Dennis Oteng*, pro se.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Dennis Oteng, is presently serving a sentence of 18 years to life for the shooting death of Kingsley Owusu. Oteng appeals an October 8, 2019 order of the Franklin County Court of Common Pleas denying his postconviction petition following a hearing. We affirm on the merits, finding that, in the absence of testimony by a key witness to resolve significant disparities between that witness' recorded statement taken soon after the shooting and his later affidavit, the trial court did not abuse its discretion in finding that Oteng had failed to establish in the postconviction hearing that his counsel's performance was ineffective and therefore unconstitutionally deficient. We also find that the trial court did not abuse its discretion in allowing an assistant prosecutor to testify at the hearing or in holding the hearing in the absence of the key witness where the witness was apparently deliberately absent, where the hearing had already been

continued once due to the witness' absence, and where Oteng took no steps to subpoena or otherwise compel the witness' presence.  We overrule all of Oteng's assignments of error.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}    On January 15, 2013, a Franklin County Grand Jury indicted Oteng for the murder of Kingsley Owusu.  (Jan. 15, 2013 Indictment.)  The Grand Jury found probable cause to indict on two alternative charges, murder and felony murder, each with a firearm specification. *Id.* Oteng pled not guilty on January 18, 2013.  (Jan. 18, 2013 Plea Form.)

{¶ 3}    During the month of April 2014, the trial court held a jury trial on the case. He was found guilty on all counts, and after merging the felony counts, the trial court sentenced Oteng to 15 years to life consecutively with a 3-year gun specification, for a total of 18 years to life.

{¶ 4}    Oteng appealed.  (June 11, 2014 Notice of Appeal.)  On direct appeal, we affirmed Oteng's conviction and stated the following to be the facts of the case, based on the trial court record:

> In the early morning hours of January 5, 2013, Kingsley Owusu was shot and killed in the parking lot of the Filipino Center on Westerville Road in Columbus, Ohio.  The victim's best friend, Benjamin Appiah, described the events that lead to Owusu's death as follows.  In the late evening of January 4, 2013, Owusu and his friend Gab[riel Basoah], also known as G-money, picked him up at home and traveled to Lounge 62 in Westerville.  When they arrived at Lounge 62, they ran into a friend by the name of David Aseidu who was at the lounge with his friend Andrea d'Almeida.  Appiah testified that he and all these other individuals hale from the West African nation of Ghana.  He described the Ghanaian community in Columbus as a fairly tight knit group, and he stated that most members of the community know each other.
>
> At Aseidu's suggestion, the group of five left Lounge 62 and headed to the Filipino Center to attend a New Year's party co-hosted by Appiah's former girlfriend, Alexis Wellington, and her best friend, Helen Mamo.  According to Appiah, he and Wellington had dated "on and off" for approximately one and one-half years prior to that time.  (Tr. 335.)  Appiah was also aware that appellant was the father of Wellington's six[-]year[-]old daughter, Michelle.
>
> When they arrived at the party, [Basoah] parked his vehicle at the back of the parking lot.  Aseidu, who was traveling with

d'Almeida, parked their vehicle closer to the main entrance of the Filipino Center. Appiah testified that he exited the vehicle and began walking toward the main entrance, just behind Owusu and [Basoah]. As [Basoah] and Owusu crossed the parking lot, a man by the name of Yaw Boayke confronted Owusu and began yelling at him in an "angry tone." (Tr. 353.) [Basoah] stepped between the two and then struck Boayke in the face with his forehead. The two men fell to the ground wrestling before Appiah was able to pull [Basoah] off of Boayke.

When Boayke returned to the Filipino Center, he was bleeding from the mouth, and he told Mamo that [Basoah] had head-butted him. By this time, Appiah had entered the Filipino Center to check out the party, while [Basoah] and Owusu waited outside. Appiah then saw appellant and "his crew" of four or five men rush past him toward the parking lot. (Tr. 371.) Appiah recognized a man he knew as Daniel, also known as D.J., and another man he knew as Stevenson following appellant out the main entrance.

At that point, Appiah went out to the parking lot where he saw appellant approaching Owusu with a handgun raised and pointed at him. Appiah got between Owusu and appellant in an effort to diffuse the situation. When he turned away from appellant to face Owusu, he saw that Owusu was holding a small handgun. Appiah pleaded with his friend to give him the gun. He told Owusu "[l]et's just leave the scene." (Tr. 370.) According to Appiah, Owusu handed him the gun.

At that moment, Appiah heard a [gunshot] ring out behind him, and he began running toward the main entrance of the Filipino Center to get away. When he reached the entrance, he realized Owusu was not with him. Concerned for his friend, Appiah turned to head back outside, but he was momentarily delayed by a security guard. When Appiah made it outside, he saw appellant and Owusu facing one another about arms['] length[] apart with appellant pointing a handgun at Owusu. Appiah testified that he was standing about ten feet away from the two men with a clear view when he saw appellant fire a shot at Owusu.

According to Appiah, the shot struck [Owusu] in the upper body, and he immediately fell to the ground. Appellant then rushed over to Owusu and began kicking him in the head. When appellant broke off his assault and ran, Appiah tried to fire a shot from Owusu's gun, but it jammed. Appiah ejected two live shells from the gun and then began running after

appellant, shooting the gun in the air as appellant fled the parking lot in his black BMW.

Owusu died as a result of a single gunshot wound to the chest. Columbus Police arrested appellant on January 6, 2013, at the home of his friend Kwame Kusi.

*State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 2-9 ("*Oteng I*").

{¶ 5} Subsequently, on Oteng's appeal of the trial court's denial of postconviction relief, we again reviewed the entire record and also stated:

The police recovered a single .380 handgun, two live .380 rounds, six spent 9 mm shell casings, and two spent .380 casings at the scene. (State's Ex. A; State's Ex. A-1.) Ballistics analysis revealed that two 9 mm casings were ejected by one firearm, four 9 mm casings were ejected from another, and the two .380 casings were spent by a third weapon. (Tr. at 318; State's Ex. S-2.) The .380 casings could neither be excluded nor identified as having been fired in the gun recovered at the scene (which Appiah testified was the one he used). (Tr. at 317, 320, 395; State's Ex. S-2; State's Ex. A-1.) That gun also did not fire the fatal bullet recovered from Owusu's body. (Tr. at 317, 320; State's Ex. S-1.)

Appiah was the only witness (out of 19 State's witnesses) who testified that he saw Oteng shoot Owusu. (Tr. at 375-76.) Appiah admitted that he initially lied to the police about whether he possessed and fired a gun on the night of the shooting. (Tr. at 394-97.) He explained that he lied because he was on probation. (Tr. at 396-97.) Although Appiah testified that Oteng was standing squarely in front of Owusu when Oteng fired, the coroner testified that Owusu was shot in the shoulder from the right side at a slightly downward angle. (Tr. at 416-20, 469-70.) The coroner explained that the bullet passed through the right shoulder at a downward angle into the right pleural cavity, passed right to left through the fifth thoracic vertebra inflicting a crush injury to the spinal cord, then punctured the left lung, and came to rest in the left pleural space. (Tr. at 449-50, Autopsy Report at 2, introduced as part of State's Ex. P.)

Basoah, Boayke, and Appiah were all tested for gunshot residue ("GSR") the evening of the shooting and all three tested positive. (Tr. at 76-77, 104-05, 745-47; State's Ex. R-1.) Testimony established that Oteng fled immediately in his BMW and the BMW was recovered the next day. (Tr. at 151, 160-63, 389.) But even though testimony also established that GSR

could have been transferred to the car by Oteng's touch and even though testimony of an expert suggested that it would have lingered within the car until the car was cleaned or driven with the windows down, the BMW was not tested for GSR. (Tr. at 151, 160-63, 752-55, 788.) Oteng's clothing was tested and tested negative for GSR. (Tr. at 762; State's Ex. R-2.)

Other than Appiah, five lay witnesses testified about the events on the evening Owusu was shot. One witness testified that he heard the shooting but did not see it. (Tr. at 192-93.) He said that he put on his glasses and looked out of his van after he heard the shots. *Id.* He saw a man with a gun kicking someone lying on the ground but explained that he could not identify anyone because it was too dark. *Id.* Another witness, who saw the confrontation from about 12 feet away, testified that Oteng was the one kicking Owusu in the head as Owusu lay prostrate. (Tr. at 255-56, 274.) But that same witness testified that she saw both of Oteng's hands during and after the kicking and he was not holding a gun. (Tr. at 276-78, 280-82.) Another witness testified that both Oteng and Appiah shot their guns before Owusu was shot and that she did not know who shot Owusu. (Tr. at 553, 570.) A final witness indicated she was inside when the shooting happened and did not see any shots fired. (Tr. at 638-39.) She indicated that someone she knew as "Daniel" or "DJ" screamed to Oteng, "you shot him, get in the car." (Tr. at 644, 647-48.) However, she admitted when she was initially interviewed by the police in the aftermath of the shooting, she told the police at least four times that Basoah was the only one who had been shooting a gun and she did not mention DJ's alleged exclamation. (Tr. at 697-98, 724-29.) A final witness testified that he had warned Oteng not to go to the party because he knew Oteng and Owusu were not on good terms. (Tr. at 813-14.) He said Oteng telephoned him at 2 a.m. on the night of the shooting and said that he had "shot him," which the witness assumed meant that Oteng was confessing to having shot Owusu. (Tr. at 816-18.) The witness went on to testify, however, that when he saw Oteng in person the next evening, Oteng asserted that a lot of people had been shooting at the party and that he did not shoot Owusu. (Tr. at 821-23, 833.)

On April 24, 2014, a jury found Oteng guilty of all counts. (Apr. 24, 2014 Verdict Forms.) During a May sentencing hearing, the trial court merged the two murder and felony murder counts and sentenced Oteng to serve 15 years to life for murder plus 3 consecutive years for the firearm specification,

> for a total sentence of 18 years to life in prison. (Tr. at 988, 990;
> May 14, 2014 Jgmt. Entry at 2.)

*State v. Oteng*, 10th Dist. No. 18AP-58, 2018-Ohio-3138, ¶ 4-8 ("*Oteng II*").

{¶ 6} In his direct appeal, Oteng raised ten assignments of error. *Oteng I* at ¶ 12. Among other arguments, Oteng maintained that his trial counsel had performed ineffectively due to a failure to review certain jail calls, failure to insist on the employment of an interpreter to translate jail calls for the jury, failure to object to hearsay testimony, and failure to object to improper comments and questions by the prosecutor. *Id.* at ¶ 86-92. On March 31, 2015, a panel of this Court overruled all his assignments of error, including the ineffective assistance of counsel arguments, and affirmed the conviction. *Id.* in passim.

{¶ 7} After litigation of a motion for a new trial and an attempted appeal to the Supreme Court of Ohio, Oteng filed a postconviction petition and amended postconviction petition (together with a motion for leave to amend) seeking to vacate or set aside the conviction. (Aug. 17, 2017 Postconviction Petition; Jan. 3, 2018 Am. Petition, attached to Jan. 3, 2018 Mot. for Leave.) In these documents, Oteng asserted a single claim, that he was deprived of his right to conflict-free counsel when his trial counsel, Javier Armengau, represented him despite an undisclosed conflict of interest and when Armengau failed to call witnesses necessary to his defense. Specifically, Oteng argued that because Armengau had been indicted for several serious offenses,[1] Armengau would not have wished to defend Oteng vigorously due to a desire to curry favor with the State. (Aug. 17, 2017 Postconviction Petition.) Oteng also argued that Armengau failed to call an exonerating witness and attached the affidavit of Seth Mensah in which Mensah swore that he personally witnessed the shooting. (Mensah Aff., Ex. D., attached to Jan. 3, 2018 Am. Petition.) Mensah averred that "[t]he person who shot Mr. Owusu was not Dennis Oteng. I did not even see Mr. Oteng with a firearm." *Id.* Mensah stated that the shootout was between "G-Money [Basoah] and Ben Appiah" and that Oteng was inside the Filipino Center when the shooting occurred. *Id.* Mensah further averred that he told the police this information and that he had attempted to contact Armengau but his contact attempts had gone unanswered. *Id.*

---

[1] Armengau was indicted in Franklin County in May 2013 for three counts of kidnapping, one count of public indecency, three counts of gross sexual imposition, six counts of rape with specifications, and five counts of sexual battery. (Ex. A, attached to Aug. 17, 2017 Postconviction Petition.)

{¶ 8} The trial court denied Oteng's initial petition without a hearing and did not mention or explicitly rule on his motion to amend his petition or the amended petition, itself. (Jan. 3, 2018 Decision & Entry.) On an appeal from that decision, we reversed, modified the trial court's decision to grant leave to amend, and remanded so that the trial court could reconsider the matter in light of the amended petition and Mensah's affidavit. *Oteng II* at ¶ 28.

{¶ 9} On remand, the trial court issued a briefing schedule on the amended petition and the parties briefed the matter. (Sept. 5, 2018 Briefing Schedule; Sept. 10, 2018 State's Memo. Contra; Oct. 3, 2018 Oteng's Reply.) Based on the briefing, the trial court scheduled a hearing. (Feb. 5, 2019 Hearing Scheduled.) The trial court continued the hearing once on its own motion and once more when Mensah failed to appear to testify. (Mar. 7, 2019 Continuance; May 22, 2019 Continuance; June 14, 2019 Hearing Tr. at 5, filed Jan. 13, 2020.) On the third scheduled date, June 14, 2019, the trial court held an evidentiary hearing on the petition and amended petition for postconviction relief. (June 14, 2019 Hearing Tr.)

{¶ 10} At the outset of the hearing, Oteng's counsel noted that Mensah had, once again, failed to appear for the hearing. *Id.* at 4. Counsel explained that Mensah's absence was apparently a deliberate choice by Mensah and that Mensah indicated he had received threats from the police. *Id.* Oteng's attorney did not request a further continuance of the hearing on the record or a warrant to secure Mensah's presence, but did request that the proceeding "be left open" so that Mensah could provide testimony whenever he might be located. *Id.* The State denied knowledge of any police threats, indicated that the police were not looking for Mensah and likely were not even aware of the hearing. *Id.* at 5. Neither the State nor the court expressly addressed on the record Oteng's request that the hearing be "left open."

{¶ 11} Two witnesses ultimately testified in the hearing. The first to testify was Oteng. Oteng testified that he hired his trial counsel, Javier Armengau, in 2013 and that Armengau did not disclose that he was under indictment. (June 14, 2019 Hearing Tr. at 9.) Oteng said that, had he been aware of Armengau's legal situation, he would not have hired him. *Id.* at 9-10. He explained that not until after the trial was concluded, did he become aware of Armengau's personal legal troubles and begin to understand, in hindsight, that he

had not been represented properly.  *Id.* at 13-14.  Specifically, he testified that Armengau was ineffective in failing to follow up on Mensah's attempts to contact counsel and in failing to call Mensah as a witness at trial.  *Id.* at 19-21.  He also added that Armengau made the incorrect decision during trial to refrain from calling Oteng's girlfriend as a witness and that, had she been called, she would have testified that Oteng had not possessed a gun.  *Id.* at 21-23.  However, Oteng also admitted that Armengau cross-examined the State's witnesses against him and successfully proved that the witnesses had changed their stories about what happened. *Id.* at 16-17.  Oteng also admitted he was unaware that Armengau had been prosecuted by the Ohio Attorney General's Office rather than the Franklin County Prosecutor's Office.  *Id.* at 12.

{¶ 12}  The second and final witness to testify was the lead prosecutor in Oteng's trial. *Id.* at 24-25.  The prosecutor testified that he provided both an audio recording of a statement given by Mensah and an informational summary prepared by the interviewing officer to Oteng's counsel in discovery.  *Id.* at 25-26.  Both recording and summary were introduced as exhibits at the hearing.  (State's Exs. A-A1.)  In the recorded statement, Mensah explained that he was at the party for 40 minutes before it was shut down (due to the shooting).  (State's Ex. A1 at 5:10-5:15, 6:45-6:59.)  Mensah said he was inside the party and heard the shots but did not know who fired shots. *Id.* at 5:05-5:42.  He stated that he saw Oteng at the party, but that they were in different places and he and Oteng did not interact that evening.  *Id.* at 7:00-7:22.  At some point, Oteng left and Mensah did not see him after that point.  *Id.* at 7:00-7:12.  The prosecutor admitted that he did not know if Mensah and Armengau had communicated.  (June 14, 2019 Hearing Tr. at 31-32.)  However, the prosecutor stated that it was his observation that Armengau seemed to have been "on his game" during the trial and did a good job.  *Id.* at 29-30.

{¶ 13}  On October 8, 2019, the trial court issued a decision denying the petition and amended petition for postconviction relief on the merits.  (Oct. 8, 2019 Entry.)  In its decision, the trial court noted that the hearing had been continued once due to Mensah's failure to appear and that Oteng's counsel had requested a continuance of the June 14, 2019 hearing when Mensah again failed to appear.  *Id.* at 2.  The trial court noted the lack of indication that Mensah had been subpoenaed in denying the continuance and proceeding in Mensah's absence.  *Id.*  The trial court in its decision recounted the evidence presented

in the hearing and concluded that the evidence did not show that Armengau provided ineffective assistance to Oteng such that his Sixth Amendment right to counsel would have been violated. *Id.* at 2-7. It therefore denied the petition (and the amended petition) on their merits. *Id.* at 7.

{¶ 14} Oteng now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Oteng alleges three assignments of error for review:

> [1.] The trial court abused its discretion when it denied Petitioner-Appellant Dennis Oteng's post-conviction petition on insufficient findings on ineffective assistance of counsel and a conflict of interest against Attorney Javier Armengau in violation of the Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution and Art. 1 Sec. 10 of the Ohio Constitution.

> [2.] The trial court abused its discretion when it denied Petitioner-Appellant Dennis Oteng's post-conviction petition after sufficient evidence was submitted at an evidentiary hearing of Attorney Javier Armengau infectiveness and a showing of a conflict of interest which warranted the conviction to be vacated.

> [3.] The trial court abused its discretion when the court over defense counsel's objection allowed the State prosecutor's office to call an assistant prosecutor to testify at the evidentiary hearing in violation of Ohio Prof. Cond. Rule 3.7.

We address the third assignment of error first, resolving the issue of the evidence before the trial court before reviewing its conclusions on the evidence.

## III. DISCUSSION

### A. Third Assignment of Error - Whether the Trial Court Abused its Discretion in Permitting the Lead Prosecutor in the Trial to Testify

{¶ 16} "Generally, '[t]he admission of evidence is within the discretion of the trial court.' " *Shaw v. Underwood*, 10th Dist. No. 16AP-605, 2017-Ohio-845, ¶ 25, quoting *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 36, citing *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38. Thus, the decision to admit or exclude evidence is reviewed for abuse of discretion. *Underwood* at ¶ 25. Yet, "[a]lthough an abuse of discretion is typically defined as an unreasonable, arbitrary, or unconscionable decision, we note that no court has the authority, within its discretion, to commit an error of law." (Citations omitted.) *State v. Chandler*, 10th Dist.

No. 13AP-452, 2013-Ohio-4671, ¶ 8; *see also JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18.  "We therefore review the decision of the trial court for abuse of discretion with the understanding that if the trial court erred on a question of law, even with respect to an evidentiary issue, that such is an abuse of discretion." *Pontius v. Riverside Radiology & Interventional Assocs.*, 10th Dist. No. 15AP-906, 2016-Ohio-1515, ¶ 15.

{¶ 17} Oteng argues that the trial court abused its discretion in permitting the lead prosecutor in his trial to testify during the postconviction hearing on the topic of Armengau's efficacy.  (Oteng's Brief at 19-22.)  Specifically, he argues that the trial court erred in that it permitted the attorney to violate Ohio Rule of Professional Conduct 3.7.  *Id.*

{¶ 18} Rule 3.7(c) provides, "[a] government lawyer participating in a case shall not testify or offer the testimony of another lawyer in the same government agency, except where division (a) applies or where permitted by law."  Division (a) of the rule states:

> (a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless one or more of the following applies:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case;
>
> (3) the disqualification of the lawyer would work *substantial* hardship on the client.

(Emphasis sic.) Prof.Cond.R. 3.7(a).  In this case, a government lawyer (with the Franklin County Prosecutor's Office) defending the State in Oteng's postconviction hearing offered the testimony of another government lawyer in the same government agency.  Prof.Cond.R. 3.7(c).

{¶ 19} The Rules of Professional Conduct are not rules of evidence and the authority to govern the bar and adjudicate violations of such rules lies solely with the Supreme Court of Ohio.  *State ex rel. Buck v. Maloney*, 102 Ohio St.3d 250, 2004-Ohio-2590, ¶ 7-8. Exclusion is sometimes a proper consideration when, for example, issues of privilege or work product are raised (which can also implicate the rules of conduct).  *See generally Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469.  But we have not found any precedent for the proposition that a violation of the

rule at issue in this case should result in an order of exclusion on appeal. In fact, out-of-district precedent is to the opposite effect. *See State v. White*, 4th Dist. No. 19CA715, 2019-Ohio-4562, ¶ 32-33.

{¶ 20} This situation implicates a circumstance where an agency (in this case, the Franklin County Prosecutor's Office) is both an advocate for its position and the substantive witness in favor of that position. *See* Prof.Cond.R. 3.7, comments [2]-[5]. However, the testimony offered here related to the nature of legal services rendered by opposing counsel in the trial that was at issue in the postconviction hearing. Prof.Cond.R. 3.7(a)(2). The comments to Rule 3.7 make clear that one of the important considerations underlying the rule is the avoidance of confusion for the factfinder. Prof.Cond.R. 3.7, comments. The testimony at issue was offered at a postconviction hearing before the trial court in support of the professional competence of defense counsel during the underlying trial, commensurately reducing the significance of this witness's testimony.

{¶ 21} We note that the same factfinder on postconviction relief, the trial court, also had the opportunity to observe and evaluate Oteng's counsel's performance during the trial. For the purpose of avoiding confusion for the factfinder, we find little to no likelihood of confusion in these circumstances.

{¶ 22} While we do not render a judgment on any alleged violation of Prof.Cond.R. 3.7(a)(2), based on the rule's purpose and the evidence in the record, we find no reversible error in the trial court's permitting the lead trial counsel for the State at trial to testify at the hearing on Oteng's motion for postconviction relief about his defense counsel's performance at trial. Thus, we overrule Oteng's third assignment of error.

**B. First and Second Assignment of Error - Whether the Trial Court Erred in Failing to Find that Armengau was Ineffective Due to a Conflict of Interest**

{¶ 23} The Ohio Revised Code provides:

> Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief.

R.C. 2953.21(A)(1)(a). This postconviction relief process is a collateral civil attack on a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994). "It is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained" in the trial court record. *State v. Murphy*, 10th Dist. No. 00AP-233, 2000 WL 1877526, 2000 Ohio App. LEXIS 6129, *5 (Dec. 26, 2000); *see also, e.g.*, *State v. Carter*, 10th Dist. No. 13AP-4, 2013-Ohio-4058, ¶ 15. "If the court does not find grounds for granting relief, it shall make and file findings of fact and conclusions of law and shall enter judgment denying relief on the petition." R.C. 2953.21(H). "If * * * the court finds grounds for relief * * * it shall make and file findings of fact and conclusions of law and shall enter a judgment that vacates and sets aside the judgment in question, and, in the case of a petitioner who is a prisoner in custody, shall discharge or resentence the petitioner or grant a new trial as the court determines appropriate." *Id.*

{¶ 24} Because the trial court is in the best position to view and weigh testimony, when we consider a trial court's determinations based on evidence obtained during a postconviction hearing, we defer to the trial court's findings and apply an abuse of discretion standard. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 46-58. Thus, we should not reverse a discretionary finding following a hearing if it is supported by competent, credible evidence. *Id.* at ¶ 58. Yet, as ever, "we note that no court has the authority, within its discretion, to commit an error of law." (Citations omitted.) *Chandler*, 2013-Ohio-4671, at ¶ 8; *see also Liggins*, 2016-Ohio-3528, at ¶ 18.

{¶ 25} In this case, the constitutional right Oteng claims was violated was his right to counsel under the Sixth Amendment to the U.S. Constitution. (Oteng's Brief at 5-18.) Specifically, he argues that although he had counsel, his attorney (Armengau) had a conflict of interest that rendered him ineffective. *Id.*

{¶ 26} In cases involving the representation of multiple defendants, the Supreme Court has stated, "[w]here there is a right to counsel, the Sixth Amendment to the United States Constitution also guarantees that representation will be free from conflicts of interest." *State v. Dillon*, 74 Ohio St.3d 166, 167 (1995), citing *State v. Gillard*, 64 Ohio St.3d 304, 312 (1992). Relying on United States Supreme Court precedent, this Court has previously held:

"* * * Prejudice is presumed when counsel is burdened by an actual conflict of interest. * * * Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts * * * it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. * * * Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' * * *"

*State v. Foster*, 10th Dist. No. 90AP-05, 1990 WL 174008, 1990 Ohio App. LEXIS 4911, *9-10 (Nov. 6, 1990), quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984). More recently, the Supreme Court of Ohio has explained, "[i]n order to satisfy a Sixth Amendment claim of ineffective assistance of counsel," based on a conflict of interest, a defendant "must demonstrate that an actual conflict of interest adversely affected his counsel's actual performance." *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, ¶ 102; *see also Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980).

{¶ 27} Though Oteng relies on the principles involved in these cases, his argument is somewhat different. (Oteng's Brief at 6.) He argues that, although Armengau was not engaged in representing another defendant whose interests were opposed to Oteng's, Armengau's own legal difficulties were such that a conflict arose. *Id.* at 6-13. That is, "Oteng [has] argued that because Armengau had been indicted for several serious offenses, Armengau would not have wished to defend Oteng vigorously due to a desire to curry favor with the State." *Oteng II* at ¶ 10.

{¶ 28} A pending criminal or ethical case against a defense attorney by the same prosecutor's office or in the same jurisdiction as the attorney's client's case, under certain circumstances can create a conflict of interest. *See*, *e.g.*, *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, ¶ 21-23, 71; *United States v. De Falco*, 644 F.2d 132, 133-36 (3d Cir.1979). As the Third Circuit put it in *De Falco*:

The adversary system of the common law, as distinguished from the inquisitorial system of the civil law, is regarded in the Anglo-American tradition as the surest method of arriving at the truth when facts are disputed, and for discerning the proper legal precepts to be applied to those facts. These goals are to be achieved by the healthy and forceful presentation of partisan viewpoints. Although the ultimate decision is always the responsibility of the jury and the judge, our system can prosper

> only when lawyers, as officers of the court, are able to develop the fullest dimensions of the cause being heard. "[The lawyer's] principal responsibility is to serve the undivided interests of his client. Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the government and to oppose it in adversary litigation." *Ferri v. Ackerman*, 444 U.S. 193, 204, * * * (December 4, 1979). If there is any constraint on counsel's complete and exuberant presentation, our system will fail because the basic ingredient of the adversary system will be missing. The essence of the system is that there be professional antagonists in the legal forum, dynamic disputants prepared to do combat for the purpose of aiding the court in its quest to do justice. Therefore, if any circumstance impedes the unqualified participation by an attorney, the adjudicatory function is inhibited, ultimately threatening the object of that function, justice in the cause at hand.

*De Falco* at 136. The Third Circuit explained why a pending criminal prosecution against an advocate by his adversary sometimes could disrupt that process:

> It is essential that the advocate owe no fealty that conflicts, or even appears to conflict, with the paramount ethical loyalty he owes his client. The competent advocate must stand tall * * * and assert his [or her] client's contentions without fear or favor. This is not the posture a defendant in a criminal case assumes as he goes, hat in hand, to negotiate a plea bargain with his adversary. Nor is it the posture a defendant assumes as he appears before the trial court following a plea of guilty to beg the mercy of the court before sentence is pronounced.

*Id.*

{¶ 29} From the record of Oteng's postconviction hearing it is clear that Armengau was prosecuted by the Ohio Attorney General's Office rather than the Franklin County Prosecutor. (June 14, 2019 Hearing Tr. at 12.) We note that, regardless of the office or title of the legal representative, the party pressing prosecution and whose interests were sought to be vindicated by the prosecution, was the State—the same party that was pursuing the prosecution of Oteng. *State v. Oteng*, Franklin C.P. No. 13CR-224; *State v. Armengau*, Franklin C.P. No. 13CR-2217. Moreover, the jurisdiction and venue of both prosecutions (Franklin County Common Pleas Court) was the same. In other words, Armengau was simultaneously litigating against the State in Franklin County on behalf of Oteng while being prosecuted by the State in Franklin County for multiple serious felonies. Thus, it

could be possible to argue that Armengau could have experienced a divided loyalty between his duty to vigorously represent his client against the State and his personal wish to avoid antagonizing either the court (that would conduct his trial and sentence him) or the State (which sought to convict and imprison him). It is also undisputed, based on the evidence presented during the hearing, that Oteng was not made aware of the possible conflict until after the representation was concluded. (June 14, 2019 Hearing Tr. at 9-14.)

{¶ 30} We need not reach that determination, however, because Oteng could not prevail in his Sixth Amendment argument unless he also established that the actual conflict "adversely affected his counsel's actual performance." *Jackson*, 2016-Ohio-5488, at ¶ 102; *see also Cuyler*, 446 U.S. at 348-50. Finding no abuse of discretion, we agree with the trial court's determination that Oteng failed to meet this burden. (Oct. 8, 2019 Entry at 4-7.) In the course of this appeal and prior appeals in this case, we have conducted a thorough review of the trial transcript, and we find no testimony or findings of the trial judge that would show the trial court abused its discretion in finding that Armengau performed effectively in Oteng's trial. *Id.*; June 14, 2019 Hearing Tr. at 29-30. Even Oteng admitted that Armengau cross-examined and managed to prove that each of the State's witnesses had altered their stories and had essentially lied. (June 14, 2019 Hearing Tr. at 16-17.)

{¶ 31} Notwithstanding the evidence of Armengau's generally good performance at trial, the facts stated by Mensah in his affidavit if credited could lead to a different conclusion on Armengau's representation in that Mensah asserts that he was a potentially exonerating witness whom Armengau ignored. (Mensah Aff., Ex. D., attached to Jan. 3, 2018 Am. Petition.) That is, Mensah in his affidavit asserts that he observed the shooting, could identify the shooters, could exonerate Oteng, previously related all of this to police, and attempted to relate it to Oteng's counsel:

> On January 5, 2013, I was at the Filipino Center on Westerville Road in Columbus, Ohio and observed Kingsley Owusu being shot and killed in the parking lot. The person who shot Mr. Owusu was not Dennis Oteng. I did not even see Mr. Oteng with a firearm. The men responsible for shooting Mr. Owusu were two men I knew as G-Money and Ben Appiah. They both arrived with Mr. Owusu and had a shootout with other people at the Filipino Center. Mr. Oteng was inside the Center when the shooting occurred. * * *

> After hearing that Mr. Oteng was charged with the crime, I attempted to contact his attorney, Javier Armengau, and relay the information I knew about the shooting. However, Mr. Armengau never returned my messages. I also told police detectives this information.

(Mensah Aff., Ex. D., attached to Jan. 3, 2018 Am. Petition.) However, Mensah's recorded statement, obtained near the time of the shooting, contradicts many of his assertions by affidavit. The recorded statement reveals that Mensah told the police that he was inside the party and therefore only heard, but did not see, the shooting, and did not know who the shooter was. (State's Ex. A1 at 5:05-5:42.) The recording also shows that Mensah admitted that he saw Oteng at the party, but did not interact with him and then saw him leave. *Id.* at 7:00-7:22. While that recorded statement does not present such facts that would make Oteng's innocence impossible, it stands in sharp contrast the clearly exonerating assertions of Mensah's later affidavit.

{¶ 32} Rather than appear and offer evidence at the postconviction hearing to resolve this conflict and support the claims made in the affidavit, Mensah twice failed to appear. (June 14, 2019 Hearing Tr. at 4-5.) The trial court also pointed out that, once the hearing was scheduled, Oteng could have subpoenaed Mensah for the hearing under Civ.R. 45 to require his presence. (Oct. 8, 2019 Entry at 2.) Oteng did not do this. Nor was evidence beyond an inadmissible statement by counsel offered to show that Mensah had been intimidated by law enforcement into avoiding the hearing. *Id.*; June 14, 2019 Hearing Tr. at 4-5, in passim. Given what was before the trial court: Mensah's conflicting counts of the events that led to the death of the victim, Kingsley Owusu, and the fact that Mensah did not appear to testify to resolve the conflict and permit the trial court to judge his credibility, we do not find an abuse of discretion in the trial court's ruling that Oteng had not proven Armengau's performance was adversely affected.

{¶ 33} Oteng also appears to argue that the trial court acted improperly in failing to continue the hearing to allow Mensah the opportunity to appear or to allow the defense the opportunity to prove that Mensah was being intimidated by the police. (Oteng's Brief at 15-16.) The hearing had already been continued once for the purpose of permitting Mensah to appear and the docket does not reflect that any attempt was made to subpoena Mensah for the second hearing or take other legal steps to ensure his presence. (June 14, 2019 Hearing

Tr. at 4-5; Docket in Franklin C.P. No. 13CR-224.)  Under the circumstances, the trial court properly acted within its discretion in proceeding with the hearing.

{¶ 34}  We overrule Oteng's second and third assignments of error.

## IV.   CONCLUSION

{¶ 35}  The trial court did not abuse its discretion in allowing an assistant prosecutor to testify at a hearing on Oteng's postconviction petition or in holding the hearing in the absence of a key witness where the record shows that witness was deliberately absent, where the hearing had already been continued once due to this witness' absence, and where no steps were taken to subpoena or otherwise compel this witness' presence, thus denying the trial court the opportunity on postconviction review to see and hear the live testimony of the witness in order to resolve the apparent disparity between his recorded statement taken soon after the shooting and his later-created affidavit and to judge his credibility.  The trial court did not commit reversible error in finding that Oteng had failed to establish that his counsel's performance was unconstitutionally deficient. We affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

NELSON, J., concurs.
SADLER, P.J., concurs in judgment only.